UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TERRY F. CLARK,

                Plaintiff,

-vs-                           Case No.  5:04-cv-667-Oc-10GRJ

DEPARTMENT OF CHILDREN AND
FAMILIES, STATE OF FLORIDA,

                Defendant.

_____

**O R D E R**

This race discrimination and retaliation case is before the Court for consideration of the Defendant's Motion for Summary Judgment (Doc. 30), to which the Plaintiff has responded (Doc. 32). The motion is ripe for review and the Court concludes that it is due to be denied.

**STATEMENT OF FACTS**

The Plaintiff, who is African-American, became employed by the Defendant, the Department of Children and Families, as a family services counselor on July 1, 2001 and was later promoted to the position of child protective investigator supervisor.[1] When the Plaintiff initially became employed by the Department, his duties included investigating child abuse, neglect, abandonment, and threat of harm.[2] He was required to conduct

---

[1]     Doc. 34, Joint Pretrial Statement, Admitted Facts, pg. 8.

[2]     Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, (continued...)

interviews, document the information he obtained in case files, and represent the Department in court.[3] When the Plaintiff became a supervisor, his responsibilities included supervising four or five investigators, maintaining a cohesive unit, providing a nurturing environment for investigators, monitoring investigator caseloads, providing timely reviews and feedback on cases assigned to investigators, communicating with his supervisor regarding the status of his unit and the well-being of the children his unit was responsible for, investigating high profile cases, and attending staff meetings.[4]

The Plaintiff testified that during his employment with the Department he received accolades for being a "super star supervisor." He stated that he had been allowed to represent the Department when the secretary of the Department visited and "[e]verything in [his] personnel file pointed toward excellence."[5] One of the Plaintiff's former supervisors testified that the Plaintiff "was one of the main reasons why the Service Center was as successful as it was."[6]

On June 27, 2003, the Office of the Inspector General issued an investigative report which cited the Plaintiff and other Department employees for mistakes in handling abuse

---

[2](...continued)
pg. 7.

[3]    Id.

[4]    Id. at 7-8.

[5]    Id. at 26.

[6]    Doc. 30, Defendant's Motion for Summary Judgment, Part 10, Deposition of Tewabech Genet Stewart, pg. 19.

investigations.[7]  Specifically, the report contained allegations that the Plaintiff "removed a protective investigator from a child abuse case without just cause" and "omitted information from the Investigative Decision Summary of Abuse Report #2002-200939 that was relevant to the safety of the children involved."[8]  The Plaintiff allegedly removed a child protective investigator from a child abuse case after telling the investigator "You don't touch teachers!" and because the investigator was "too intrusive and intimidating."  Thereafter, the Plaintiff allegedly prepared a final report of investigation and did not include certain collateral contacts interviewed by the investigator or specific unfavorable information about the children's mother, including allegations that she failed to obtain timely medical treatment for the children and possible child neglect.  The inspector general's office concluded that the allegations against the Plaintiff were substantiated.[9]

The Plaintiff admitted that he failed to disclose information about the children's mother in the child abuse report reviewed by the inspector general, but he did not believe that the omission was a mistake because the information was not relevant or was excluded to protect the child's privacy.[10]  In particular, the Plaintiff explained that the allegations in

_____

[7]     Doc. 34, Joint Pretrial Statement, Admitted Facts, pg. 8; Doc. 30, Defendant's Motion for Summary Judgment, Part 2, Investigative Report.  The Joint Pretrial Statement states that the report was issued in 2004; however, the record suggests otherwise.

[8]     Doc. 30, Defendant's Motion for Summary Judgment, Part 2, Investigative Report, pg. 3.

[9]     Id. at 4.

[10]     Doc. 34, Joint Pretrial Statement, Admitted Facts, pg. 8; Doc. 30, Defendant's Motion
(continued...)

the inspector general's report arose out of a child abuse case that initially concerned a domestic violence incident between the mother and father.[11]  The Plaintiff testified that the parents had separated and the case was moving toward a custody issue which the court would resolve.  The Plaintiff stated that in this type of situation, "the Department lets the family resolve their issues in court."[12]  The Plaintiff believed that the children were not at risk since the children were older, the family was receiving support from the community, the father was a businessman and the mother was a teacher, and this was the family's first report.  The Plaintiff stated that he did not include information in the investigative summary about one of the children's illnesses because he did not feel like the information was relevant and the information would stigmatize the child as the report would be brought up in custody court. The Plaintiff further testified that the investigator was removed from the case and he took over the investigation at the direction of his supervisors, Tony White and Janet Johnson, after a "governor's complaint" was filed.

On Wednesday, October 22, 2003, the Plaintiff was advised by Jeff Carr, director of human resources for the Department, and Bill D'Aiuto, a district operations manager for the

---

[10](...continued)
for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 57, 62-63.

[11]      Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 11.

[12]      Id. at 12.

Department, that he was going to be demoted from supervisor to an investigator position.[13]

When the Plaintiff was informed of his demotion by Mr. Carr and Mr. D'Aiuto, the Plaintiff

testified that they cited their concerns about the inspector general's report involving the

Plaintiff omitting information relevant to a child's safety from a report, as well as the

Plaintiff's failure to have the second child abuse investigation involving the same family that

was the focus of the inspector general's report referred to a different Service Center rather

than the Plaintiff becoming involved with the same family again.[14]   The Plaintiff did not

accept the demotion to investigator initially because he wanted to consider his options.[15]

Mr. D'Aiuto expected the Plaintiff to get back with them within a day or two to let them if he

would accept the demotion and work as an investigator.[16]

---

[13]      Doc. 34, Joint Pretrial Statement, Admitted Facts, pg. 8; Doc. 30, Defendant's Motion for Summary Judgment, Part 9, Deposition of William D'Aiuto, pg. 7-8; Doc. 33, Plaintiff's Response to Motion for Summary Judgment, Part 6, Plaintiff's Answers to Interrogatories, pg. 11. The Joint Pretrial Statement suggests that the Plaintiff was demoted on Thursday, October 23, 2003, but the record suggests that the Plaintiff was actually demoted on Wednesday, October 22, 2003.

[14]      Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 20-21.

[15]      Id. at 19-20, 22.

[16]      Doc. 30, Defendant's Motion for Summary Judgment, Part 9, Deposition of William D'Aiuto, pg. 10.

On Thursday, October 23, 2003, the Plaintiff received an email from Mr. D'Aiuto, which was sent at 5:18 p.m., stating "Jeff and I will call you tomorrow regarding your employment options.  It should be before 12PM."[17]

Mr. D'Aiuto testified that the day after he advised the Plaintiff of his demotion, or on October 23, 2003, he obtained additional information which would ultimately lead to the termination of the Plaintiff's employment.  In particular, he learned that after issuing its report, the Office of the Inspector General called in an additional abuse report concerning the same family which was the subject of the inspector general's report, and requested that an additional investigation be conducted by Department officials in Sumter County (rather than Lake County).[18]  The Plaintiff allegedly went over the supervisor in Sumter County and told the Lake County child protection team office, which provides medical examinations and opinions to the Department on child abuse cases, to disregard any request for their involvement on that particular case as the investigator had requested.[19]  In short, the Plaintiff interfered with the investigation which again could have altered the final outcome of the child abuse case.[20]

---

[17]     Doc. 33, Part 4, Email from William S. D'Aiuto to Terry Clark.

[18]     Doc. 30, Defendant's Motion for Summary Judgment, Part 9, Deposition of William D'Aiuto, pg. 11.

[19]     Id. at 11-12.

[20]     Id. at 12.

On the morning of October 24, 2003, the Plaintiff filed a discrimination complaint with the Florida Commission on Human Relations against the Department.[21]  On the same date and before the Plaintiff was terminated, the Plaintiff spoke with Genet Stewart, the Plaintiff's former supervisor, and advised her that he was going to file a discrimination complaint against the Department.[22]  The Plaintiff testified that Ms. Stewart was in constant communication with Mr. D'Aiuto regarding the Plaintiff's decision to accept the demotion to investigator.[23]  The Plaintiff also testified that on the same date, early in the morning, he left a voice mail for Mary O'Quinn, the EEOC contact for the Department, about the complaint.[24]  Lastly, although the Plaintiff did not tell Mr. Carr or Mr. D'Aiuto that he intended to file a discrimination complaint against the Department at the time of his demotion, he "told them the work environment was hostile and that [he] felt like [he] was being treated differently."[25]

At approximately noon on October 24, 2003, the Plaintiff spoke Mr. Carr who told the Plaintiff that "they weren't going to be offering [the Plaintiff] any positions, that the

---

[21]     Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 25; Doc. 33, Part 7, Florida Commission on Human Relations Employment Charge of Discrimination dated October 24, 2003, 10:08 a.m.

[22]     Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 22, 54-55.

[23]     Id. at 24.

[24]     Id. at 22.

[25]     Id. at 23.

investigator position had been taken off the table and that they also were not going to be able to place [him] in the other position that [they] had talked about."[26]  The Plaintiff stated that he was told he was being terminated rather than demoted because the Department "needed to move on" and because of the Plaintiff's "poor job performance and bad decision-making."[27]  Mr. Carr testified that the Plaintiff was terminated for "not performing his duties in a satisfactory manner."[28]  Specifically, Mr. Carr stated that "the narratives, the paperwork, the case files, the visitations were not being done [in the Plaintiff's unit] according to the program and the program administrator to the satisfaction of the district."[29]  James T. Clark, the interim district administrator at the time of the Plaintiff's termination who had the authority to terminate the Plaintiff's employment, testified that he "made the decision to terminate Terry F. Clark solely based on his misconduct in the handling of an abuse investigation."[30]

The Department sent the Plaintiff two letters advising him of his termination.  The letter dated Wednesday, October 22, 2003 was received by the Plaintiff on October 30, 2003, and the letter dated Friday, October 24, 2003 was received by the Plaintiff on

---

[26]   Id.

[27]   Id. at 24.

[28]   Doc. 30, Defendant's Motion for Summary Judgment, Part 7, Deposition of Jeff Carr, pg. 7.

[29]   Id. at 10.

[30]   Doc. 30, Defendant's Motion for Summary Judgment, Part 4, Declaration of James Thom Clark.

October 25, 2003.[31]  The letter dated October 22nd was written "to officially inform [the Plaintiff] that [he was] being terminated from [his] position as a Child Protective Investigator Supervisor – SES in District 13 effective close of business, *Thursday, October 23, 2003.*"[32] The letter dated October 24th was written "to officially inform [the Plaintiff] that [he was] being terminated from [his] position as a Child Protective Investigator Supervisor – SES in District 13 effective close of business, *Friday, October 24, 2003.*"[33]  Both letters also stated that the Plaintiff's termination was done pursuant to § § 110.601-110.606, Florida Statutes, covering members of the selected exempt service system who are subject to dismissal at the discretion of the agency head, and that the Plaintiff may contact human resources regarding his options for insurance and other benefits.  The Plaintiff believed that the October 22nd letter was actually backdated so that it seemed as though the decision to terminate the Plaintiff occurred prior to the October 23rd demotion meeting and the filing of his discrimination complaint.  The Plaintiff testified that it did not make sense for the Department to offer him a demotion on October 23rd after already writing a letter of termination on October 22nd.[34]

---

[31]  Doc. 34, Joint Pretrial Statement, Admitted Facts, pg. 8-9.

[32]  Doc. 30, Defendant's Motion for Summary Judgment, Part 3, Termination Letters (emphasis added).

[33]  Id.

[34]  Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 24.

The Plaintiff testified that the following non-minority employees at the Department were treated differently than he was: (1) Tom Oliver, a white supervisor, who was cited in an inspector general's report for failing to report sexual abuse in a case;[35] (2) Shelby Wilson, a white male, who was cited in a death review case for failing to have a reunification staffing in a case where the child was returned to the parent and then later found dead in the Ocala National Forest;[36] (3) Ronneye Dragul, a white female cited in an inspector general's report, who provided non-certified employees with access to the Florida abuse hotline information system;[37] (4) Robert Betts, a white male cited in an inspector general's report, who provided non-certified employees with access to the Florida abuse hotline information system;[38] (5) Terry Harris, a white male cited in an inspector general's report, who failed to report sexual abuse in a case;[39] (6) George Juaristic, a "white hispanic male" cited in an inspector general's report, who provided non-certified employees with access to the Florida abuse hotline information system and assigned cases to a non-certified employee.[40]   The Plaintiff testified that he knew these individuals were not

---

[35]   Id. at 16.

[36]   Id. at 34.

[37]   Id. at 36.

[38]   Id. at 37.

[39]   Id. at 38.

[40]   Doc. 33, Plaintiff's Response to Motion for Summary Judgment, Part 6, Plaintiff's Answers to Interrogatories, pg. 8-9.

disciplined because after the inspector general reports were issued, "these people continued to work, and they never said anything about being disciplined whatsoever."[41] The Plaintiff further testified that typically when an employee omitted information that is relevant to child safety, you would receive a corrective plan, not be terminated.[42]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."[43]  As the Supreme Court held in Celotex Corp. v. Catrett, the moving party bears the initial burden of establishing the nonexistence of a triable fact issue.[44]  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[45]  The non-moving party

---

[41]     Doc. 30, Defendant's Motion for Summary Judgment, Part 6, Plaintiff's Deposition, pg. 38.

[42]     Id. at 39.

[43]     Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[44]     477 U.S. 317 (1986).

[45]     Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[46]

## DISCUSSION

The Plaintiff's Complaint alleges that the Department discriminated and retaliated against him while he was employed with the Department in violation of the Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e *et seq.*  The Court will address each claim in turn.

## I. Discrimination: Disparate Treatment

The Plaintiff contends that the Department treated him differently than other non-minority employees who made similar or more serious mistakes than the Plaintiff.  To prevail on a disparate treatment claim, the Plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the job or benefit at issue, (3) he was subjected to an adverse employment action, and (4) his employer treated similarly situated employees who were not members of his protected class more favorably.[47]  Once a prima facie case is established, a presumption of unlawful discrimination arises.[48]  An employer may rebut the presumption of discrimination by articulating legitimate, non-

---

[46]     Celotex, 477 U.S. at 324.

[47]     Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 842-43 (11th Cir. 2000).

[48]     Walker v. Prudential Property and Cas. Ins. Co., 286 F.3d 1270, 1274 (11th Cir. 2002).

discriminatory reasons for taking the adverse employment action or actions.[49]  If the employer is successful on this score, the presumption disappears from the case, and the plaintiff is left with the ultimate burden of convincing the fact finder that a discriminatory reason more likely than not motivated the employment action.[50]  To avoid summary judgment, however, the Plaintiff must produce evidence sufficient to create a genuine issue of fact that the reasons proffered by his employer are merely pretext for unlawful discrimination.[51]  "[T]o directly attack [the Defendant's] reasons, [the Plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence."[52]

The Court concludes that Plaintiff has presented sufficient circumstantial evidence to establish a prima facie case of racial discrimination under Title VII.  It is undisputed that the Plaintiff is a member of a protected class and his employment with the Department was terminated.  In addition, there is evidence that the Plaintiff was

---

[49]   Id.

[50]   Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 256 (1981).

[51]   Brooks v. County Comm'n of Jefferson County, 2006 WL 997725 (11th Cir. 2006).

[52]   Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (internal quotations and citations omitted).

qualified to perform his job and other similarly situated employees who were not members of a protected class were treated more favorably than the Plaintiff.[53]

Since the Plaintiff has established a prima facie case of racial discrimination, the burden shifts to the Department to present legitimate, non-discriminatory reasons for its actions.  While the Department may be able to meet this burden, the Plaintiff has also met the burden of showing the existence of a material issue of fact concerning the Department's proffered reasons for terminating the Plaintiff.[54]  Specifically, the fact that the Department waited approximately four months to terminate the Plaintiff after the inspector general cited the Plaintiff in one of its reports, together with the Department's varying reasons for terminating the Plaintiff and evidence of differential treatment of other non-minority employees who also failed to report relevant child safety information, create a genuine issue of fact as to whether the Department's proffered reasons for terminating the Plaintiff are mere pretext for discrimination. Accordingly, summary judgment with respect to this claim is due to be denied.

---

[53]     Although there is evidence that non-minority employees provided unauthorized access to the abuse hotline and were not terminated, the Court finds that this evidence is insufficient to support the fourth element of the Plaintiff's prima facie case – that the Department treated similarly situated employees who were not members of the Plaintiff's protected class more favorably – because these employees are not similarly situated.  However, evidence that two non-minority employees failed to report sexual abuse in a child abuse case and were not terminated are similarly situated and sufficiently supports the fourth element of the Plaintiff's prima facie case.

[54]     See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (holding that  "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated).

## II. Retaliation

Title VII also makes it unlawful for an employer to discriminate against an employee that has engaged in statutorily protected expression.[55]  And, the Court has held that a claim for retaliation pursuant to 42 U.S.C. § 2000e-3, is subject to the <u>McDonnell Douglas</u> burden shifting framework.[56]

Thus, in order to establish his prima facie case of retaliation, the Plaintiff must show that he has suffered an adverse employment action, and that such action was causally related to his complaint.[57]  "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."[58]

Then, if the Plaintiff establishes his prima facie case, the Department may proffer legitimate, non-discriminatory reasons for its employment action, and the Plaintiff must offer evidence to demonstrate that the Department's reasons are a mere pretext for retaliation.[59]  If the Plaintiff creates an issue of  fact as to the reasonableness of the Department's actions, then summary judgment for the Department would be inappropriate.

---

[55]     42 U.S.C. § 2000e-3.

[56]     <u>Chambers v. Walt Disney World Co.</u>, 132 F. Supp. 2d 1356, 1368 (M.D. Fla. 2001).

[57]     <u>See</u> <u>Holifield v. Reno</u>, 115 F.3d 1555, 1566 (11th Cir. 1997).

[58]     <u>Bass</u>, 256 F.3d at 1119 (quotations and citations omitted).

[59]     <u>Holifield</u>, 115 F.3d at 1566.

The Court concludes that summary judgment with respect to the Plaintiff's retaliation claim is due to be denied since there is evidence that the Department was aware that the Plaintiff filed a discrimination complaint on the morning he was terminated and since the Department's sudden decision to terminate the Plaintiff rather than demote him occurred within close proximity to the time the Plaintiff filed his discrimination complaint.

## CONCLUSION

Accordingly, upon due consideration, it is ordered that the Defendant's Motion for Summary Judgment (Doc. 30) is DENIED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 23rd day of May, 2006.

_____

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record